UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

UNITED STATES OF AMERICA

                                                            S1 20 Cr. 470 (PKC)

        v.


ANDREW BROWN,

                        Defendant.

-----------------------------------------------------------------------X



**SENTENCING SUBMISSION ON BEHALF OF ANDREW BROWN**



                                    SPEARS & IMES LLP
                                    Max Nicholas
                                    mnicholas@spearsimes.com
                                    Reed M. Keefe
                                    rkeefe@spearsimes.com
                                    767 Third Avenue
                                    New York, New York 10017
                                    Tel: (212) 213-6996
                                    Fax: (212) 213-0849

                                    *Attorneys for Defendant Andrew Brown*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

    I.    Personal History and Characteristics ...................................................................... 2

        a.   Drew's Traumatic Childhood.......................................................................... 2

        b.   Drew's Education and Career ......................................................................... 3

        c.   Drew's Strong Partnership with His Wife, Meg ............................................ 5

        d.   Drew's Close Bond with His Three Children ................................................. 6

        e.   Drew's Service to His Community and Care for Family Members................................ 7

        f.   Drew's Health ............................................................................................... 10

    II.   Relevant Facts Concerning the Offense of Conviction and Drew's Arrest and Trial.... 10

        a.   Drew's Involvement with LEEBA and LEEBA's Annuity Fund ................................... 10

        b.   The Impact of the Charges and Conviction on Drew and His Family ......................... 13

DISCUSSION ................................................................................................................. 15

    I.    Applicable Legal Standard..................................................................................... 15

    II.   Advisory Guidelines Calculation .......................................................................... 16

        a.   Loss Amount ................................................................................................. 17

        b.   Forthcoming Guidelines Amendment Concerning Zero Criminal History Point

        Offenders.................................................................................................... 22

    III.   The Section 3553(a) Factors Counsel in Favor of a Below-Guidelines Sentence ......... 23

        a.   The Nature and Circumstances of the Offense.............................................. 23

        b.   The History and Characteristics of the Defendant ....................................... 25

        c.   A Sentence of Probation Will Adequately Deter Future Criminal Conduct ................. 26

d.   Avoidance of Sentencing Disparities .............................................................. 28

e.   Types of Sentences Available ....................................................................... 32

f.   Providing for Restitution ............................................................................. 33

IV.   A Fine Is Not Warranted .................................................................................. 33

CONCLUSION ................................................................................................................ 33

## PRELIMINARY STATEMENT

We respectfully submit this memorandum in advance of defendant Andrew ("Drew") Brown's sentencing, scheduled for January 17, 2024. On May 30, 2023, following a one-week jury trial with co-defendant Kenneth Wynder, Drew was convicted of one count of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and one count of wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with a charged scheme to withdraw money from the Annuity Fund associated with the Law Enforcement Employees Benevolent Association ("LEEBA") under fraudulent pretenses. Drew is not in custody and is subject to substantially the same bail restrictions that have applied since his arrest in July 2021.

For the reasons set forth herein, we respectfully ask the Court to impose a sentence on Drew that does not require a period of imprisonment. We do not make such a request lightly, as we appreciate that the charged offenses are serious ones and that a probationary sentence would fall below the advisory United States Sentencing Guidelines range. However, such a sentence is merited here. Drew's extraordinary personal history and characteristics – in particular his commitment to his family and community – taken together with the nature and circumstances of his role in the charged offense and the need to avoid disparities with similarly situated defendants, render a term of imprisonment unnecessary in this case to achieve the aims of sentencing. In the specific circumstances of this case, a sentence that does not require jail time is sufficient, but not greater than necessary, to reflect the seriousness of the charged offense; to deter Drew and others from violating the law; and to constitute a just punishment. Jail time is a

greater punishment than necessary in Drew's case, and we ask the Court to fashion a sentence that does not require it.[1]

## FACTUAL BACKGROUND

### I.  Personal History and Characteristics

#### a.  Drew's Traumatic Childhood

Although today Drew's family life is characterized by its happiness and warmth, that is something Drew has worked extremely hard his entire adult life to build.  It was not the case in his early life.  Drew was born in Brooklyn in 1967 to Joseph Brown and Diane Brown, née Milde.  (PSR ¶ 78.[2])  Drew's father worked as a boiler engineer for the New York City Department of Education, and his mother was a schoolteacher.  (*Id.*)  During Drew's childhood in Rockaway, Queens, his family's life was marked by tragedy.  A year before Drew's birth, his brother Peter died of Sudden Infant Death Syndrome.  (*Id.* ¶ 79.)  When Drew was only six years old and his brother Steven was just fourteen, Steven died of a gunshot wound, after a gun Drew's father had left out in the house accidentally discharged.  (*Id.*)

Throughout these horrific events, Drew and his two sisters had a volatile, and violent, relationship with their father.  Drew's father was an alcoholic who was physically abusive to his wife and children and even violent toward the family's pets.  (*Id.* ¶ 80; *see also* Ex. A, at 013

---

[1] Drew respectfully reserves the right to appeal from his conviction and from the Court's denial of his Rule 29 Motion.  For purposes of this sentencing submission, we do not dispute the Government's presentation of the evidence at trial or the verdict, but we do not intend for anything in this submission to concede or waive arguments Drew may choose to advance in an appeal.

[2] "PSR" refers to the Final Presentence Investigation Report dated September 12, 2023 and located at ECF 226.

(Denise Brown) & 154 (M. Szawaluk).)[3]  Drew's father's employment provided the bulk of his family's income, and, when his parents separated, the family struggled financially.  (PSR ¶ 80.) In 1977, Drew's father was found dead, from what the coroner suspected was alcohol-related causes but what was eventually ruled to be a cardiac arrest.  As Drew's sister Denise recalls, with understatement, this period was "difficult and tumultuous" for their family.  (Ex. A, at 013 (Denise Brown).)  Drew subsequently attended a counseling group in high school and later helped to counsel other students undergoing difficult times at home – an instinct to help others that characterizes his entire life.  (Ex. A, at 091 (D. Hitter).)

Following Drew's father's death, his mother Diane remarried a man named Robert Hitter. (PSR ¶ 78.)  Robert, who Drew now considers his father, was a loving and supportive addition to their family.  Robert later adopted Drew and his sisters.  (Ex. A, at 093 (R. Hitter).)  Drew's mother Diane has now retired as a schoolteacher and she and Robert, a Catholic deacon, live in Massachusetts.  (PSR ¶ 78.)

Each of Drew's parents, his sister Marianne, and his sister Denise is aware of Drew's recent conviction (and Marianne and Denise attended his trial).  They continue to form an important network of emotional support for Drew, his wife of 27 years, Meg, and their three children.

### b.  Drew's Education and Career

Drew graduated from Archbishop Molloy High School in Jamaica, Queens in 1985. (PSR ¶ 102.)  During high school, Drew worked numerous jobs in order to contribute financially to his family.  (*Id.*; *see also* Ex. A, at 091 (D. Hitter).)  He did the same when he attended Pace

---

[3] Letters of support written on Drew's behalf are collected in Exhibit A, appended hereto.  The name of the letter writer is indicated in parentheses.

3

University after high school, working approximately 30-35 hours a week as a taxi driver and a part-time call center worker at Citibank, among other jobs.  (PSR ¶¶ 103, 111.)

While working in Citi's call center, his supervisors were so impressed by his work ethic that they offered him a full-time position and a scholarship to attend night school at Pace.  (*See id.* ¶ 110.)  Following his college graduation in 1990, Drew continued to work at Citi.  (*Id.*)  He subsequently moved to PNC Bank for a role as a regional business banker, and then to Chase Bank as an Assistant Vice President in commercial lending.  (*Id.* ¶¶ 108-09.)

In 2000, Drew decided to open his own financial services firm, Strategic Planning Services ("SPS").  (*Id.* ¶ 107.)  Throughout its existence, SPS was a modest operation.  Initially, Drew rented office space from another entity.  (*Id.*)  Around the time he started his business, he also delivered pretzels in order to ensure that he could support his young family; "[h]e was out the door at 3:30am to work the route and came home at 10:30am to shower and begin working into the evening at his fledgling financial practice."  (Ex. A, at 019 (M. Brown).)

At SPS, Drew typically worked with one other person.  (*See, e.g.*, Tr. 163).[4]  He made approximately $30,000 to $40,000 a year at first, but his earnings later increased to $140,000 to $150,000 per year.  (PSR ¶ 107.)  His goal was to build a small business that he could pass to his children but that would not be so busy or all-consuming that it would mean that he missed their childhoods.  (Ex. A, at 019-020, 023 (M. Brown).)

A point of pride for Drew was being able, through SPS, to assist law enforcement unions when they needed to obtain benefits.  In addition to LEEBA, among SPS's clients were the Westchester County Police Benevolent Association, the Boston Police Detectives Benevolent Society, and the White Plains Police Benevolent Association.  Drew's clients typically came to

---

[4] "Tr." refers to the trial transcript.

4

him through word-of-mouth referrals.  (*Id.* at 023 (M. Brown).)  In light of the service of these

unions' members, it was important to Drew to give back to them by engaging in charitable work

that benefitted law enforcement.  (*Id.*; *see also id.* at 029 (R. Butler) (discussing Drew's

assistance to Boston Police officers following the 2013 Boston Marathon bombing).)

Although he had a Series 6 license for a portion of his career (PSR ¶ 105), Drew did not

typically advise clients on retirement products.  Instead, he generally acted as the insurance

broker for various individuals and groups.  (*Id.* ¶ 107.)  Particularly gratifying to Drew was

brokering life insurance policies for his clients.  Remembering the strain on his family at the time

of his father's death made Drew committed to ensuring that none of his clients were without the

means to bury their loved ones or carry on in their absence.  (*See* Ex. A, at 018 (J. Brown).)

### c.  Drew's Strong Partnership with His Wife, Meg

In 1989, Drew was introduced by friends to his future wife, Margaret (née Zevola), who

is known as Meg to her friends and family.  (PSR ¶ 82.)  They married in 1996.  (*Id.*)  Their

marriage is happy and loving; Drew is, as Meg puts it, her "partner and best friend."  (Ex. A, at

023 (M. Brown).)  Drew is extremely proud of Meg's work as a pediatric surgical nurse, and

now as the Nurse Clinician, Perioperative Educator at Westchester Medical Center, a role that

requires her to train other nurses in her specialty.  (*See id.* at 019.)

Meg and Drew endured an extremely difficult first year of marriage, after ███████

███████████████████████  in 1996.  They later learned that the perpetrator had organized

crime connections.  (*Id.* at 020.)  Despite threatening hang-up phone calls and strange cars

driving by their house at night, both Drew and Meg elected to testify at the trial.  (PSR ¶ 82.)

They could not countenance the idea that ███████████████████  if they did not speak

up.  (Ex. A, at 020 (M. Brown).)  They were devastated when, after the trauma of the trial, the

assailant was convicted of a lesser charge of ███████████.  (*Id.*); *see also* ████

███████████████████████████████████████████████████████).

Meg credits Drew's steadfast support with helping her endure this awful period.  She

writes:

> The love and support Drew gave me was a source of strength that helped me
> overcome the emotional trauma of both the ████ and the criminal case that
> followed.  It is the type of trauma that many new marriages might not survive.
> His love and devotion helped us grow stronger.  His sense of humor and his
> strength helped me feel safe again.

(Ex. A, at 020 (M. Brown).)  They have weathered other difficulties side-by-side, including the

recent death of Meg's father.  (*Id.* at 022.)  "[T]ogether," Meg says, "[we] have lived a life of

which we are very proud."  (*Id.* at 023.)

### d.  Drew's Close Bond with His Three Children

Drew and Meg are equally proud of their three children, Steven, aged 25, who is named

after Drew's brother who passed away when Drew was a child; Jacqueline, aged 24; and

Douglas, aged 19.  (PSR ¶ 83.)  Steven recently served in the United States Merchant Marine

with the Military Sealift Command.  He attended part of the trial until he had to go back to sea.

He is now beginning work as an engineer with Con Edison.  Jackie, who attended much of

Drew's trial, works with the American Automobile Association as an insurance broker.  Doug,

who also attended much of the trial, is beginning his second year at SUNY Cortland and aspires

to be a teacher, like his grandmother and aunt.  (*See id.*)

Drew has strived to be involved in his children's lives in a way his father never was; his

sister Marianne observes:  "I do believe that the disturbance in our familial environment drove

Drew to be a wonderfully engaged parent, who continues to take great interest . . . in each of his

children's activities, growth, and happiness."  (Ex. A, at 154 (M. Szawaluk); *see also id.* at 022

(M. Brown).)  Throughout their lives, Drew has coached each of his children's sports teams, teams that were notable for the fact that, even though they didn't always win, every single child on the team got to participate.  (*See, e.g.*, *id.* at 015 (Douglas Brown), 062 (E. Ferrari), 091-92 (D. Hitter).)  He has taught their religious study groups.  (*See, e.g.*, *id.* at 024-25 (S. Brown).)  He has led their scouting troops, helping his older son achieve the rank of Eagle Scout.  (*See, e.g.*, *id.* at 025.)

Drew has also fostered each of his children's interests in what would later become their careers.  He helped his older son rebuild a scooter, an activity that inspired him to become an engineer.  (*Id.* at 021-22 (M. Brown).)  He encouraged his daughter to obtain her insurance license.  (*Id.* at 018 (J. Brown).)  And, Drew's love of history sparked his youngest son's interest in studying to become a history teacher.  (*Id.* at 022 (M. Brown); *see also id.* at 015 (Douglas Brown).)

Steven, Jackie, and Doug are honest, kind, and hard-working young adults – qualities they and others around them attribute in large part to Drew's influence.  As one longtime neighbor of Drew's notes, "I have personally seen the remarkable respect and behavior exhibited by his three children, Steven, Jackie and Douglas. . . . [T]heir positive traits are a glimpse of the love and guidance provided by Drew as a father."  (*Id.* at 011 (K. Bianco); *see also, e.g.*, *id.* at 006 (Rob Anderson), 049 (C. Effinger), 101 (J. Listwan).)  His youngest son echoes these sentiments:  "My father has been the biggest role model in my life.  From a very young age he taught me to show respect, kindness, [and] manners."  (*Id.* at 015 (Douglas Brown).)

### e.  Drew's Service to His Community and Care for Family Members

One way in which Drew has reinforced the values he has taught his children is through community service.  Drew's commitment to those in need in his community is long-standing.  A

friend of Drew's for over thirty years describes his generous spirit:  "Drew doesn't wait to be

asked for help, he just does it.  No questions asked.  That is just who he is. . . . Not many people

even know [about his acts of kindness] as he doesn't tell anyone.  He just does it."  (*Id.* at 001 (E.

Adler).)

        In addition to, as discussed above, coaching children's sports teams and leading boy

scout troops, Drew served for years as a volunteer firefighter and member of the ambulance

corps in Lake Mohegan and Putnam Valley, New York.  (PSR ¶ 104.)  One firefighter who

worked with Drew remembers that he "always exceeded the required number of fire/emergency

calls" and was "steadfast regardless of the situation."  (Ex. A, at 081 (G. Grimaldi).)  The same

person writes that Drew is deserving of the "best compliment" a firefighter could give:  "I would

not hesitate to enter a burning building with [him], knowing that [he] would not leave me if

things took a turn for the worst."  (*Id.*)  In his capacity as a volunteer firefighter, Drew spent

weeks following the attacks of September 11th, working around the clock to support the recovery

effort.  (*Id.*; *see also id.* at 063 (R. Ferrari).)  This is a truly extraordinary testament to Drew's

character.

        Drew has also been a champion of the vulnerable throughout his adult life.  He organized

a group of neighbors to check in on and provide supplies to elderly people in his community

when the weather is bad or they might otherwise need assistance.  (*See, e.g.*, *id.* at 012 (M.

Bourgie), 037 (K. Cooke).)  The letters from some of those he has helped through this group

speak volumes about how meaningful this support is to them.  (*Id.* at 106 (J. Magee), 113 (J.

Murphy).)

        Drew also organized a large effort following Hurricane Sandy to help those in his former

hometown of Rockaway to recover.  His sister Denise recalls Drew filling his trailer up seven

times with supplies and driving them back to those in need after the hurricane.  (*Id.* at 014 (Denise Brown).)  And, those who received his help after that devastating storm still vividly recall Drew's commitment to getting them back on their feet.  (*See, e.g.*, *id.* at 089 (D. Hickey), 119 (J. O'Sullivan), 120 (W. O'Sullivan).)

Within his own family, Drew is the person who drops everything to take care of whoever is in need.  Drew's sister Denise says that she "owe[s Drew her] life," after he and Meg cared for her for a year in their home while she was being treated for Stage 3C breast cancer.  (*Id.* at 014 (Denise Brown).)  They did the same after Denise's recent thoracic surgery and provided her with not only the care she needed but also the support and company to "keep [her] spirits up." (*Id.*)  Drew and Meg have also cared for both his mother and stepfather in the Browns' home after medical crises, and then helped them transition back to their home in Massachusetts.  (*Id.* at 092 (D. Hitter); *id.* at 093-94 (R. Hitter).)  As Drew's mother says, Drew "is a devoted son.  He is an integral caregiver to my husband and I and is essential to our living independently."  (*Id.* at 092 (D. Hitter).)  The need for Drew's support in his parents' lives is only increasing.  His mother is currently 90 years old, and his stepfather, in early September, required surgery and related treatment for tumors on his skull.  Drew and his sister Marianne took turns caring for him as he recuperated.  (*See* ECF 225.)

Drew's quiet acts of kindness are not limited to his family.  Numerous friends of Drew's describe how he is the person they would turn to in a personal crisis, on the anniversary of a tragedy, or when they are ill.  (*See, e.g.*, Ex. A, at 082 (L. Gruppuso), 086 (C. Harris), 101 (J. Listwan), 133 (S. Porteus), 160 (M. Talbot).)  Drew's generosity and charity is, in short, not occasional or confined to times when it is convenient to him; it is part of who he is, and it has had a lasting impact on those around him.

9

### f.  Drew's Health

Currently, Drew is treated for a number of serious, though presently non-life threatening, conditions.  Specifically, he is treated for asthma, and he takes painkillers and muscle relaxants to address knee pain from a previously repaired meniscus.  (PSR ¶ 92.)  Drew was also diagnosed two years ago with generalized anxiety disorder.  He is prescribed multiple medications to manage his anxiety and sleeplessness.  (*Id.* ¶ 93.)

In addition, during a recent visit to the Emergency Room, Drew was found to have elevated liver enzyme levels.  This condition will require future monitoring.

## II. Relevant Facts Concerning the Offense of Conviction and Drew's Arrest and Trial

### a.  Drew's Involvement with LEEBA and LEEBA's Annuity Fund

In approximately 2007, when Drew was serving as a volunteer firefighter, he learned from another firefighter that LEEBA was looking for a professional to manage its members' benefits.  Working with LEEBA appealed to Drew because the union represented law enforcement officers who did not always receive the recognition or benefits that they should, such as those from the Department of Transportation or Department of Environmental Protection.  Drew's mother and stepfather were part of New York City's teachers' union, in which his stepfather served as a delegate, and Drew knew the importance of strong union representation from their experiences.  He had also seen firsthand how important School Safety Officers were to the schools where his sister and mother taught, and hoped that they too would receive the type of representation afforded to the New York City Police Department.  When Drew later assisted with recruitment activities for LEEBA (*see* Tr. 432), it was because he believed in this mission.

10

After learning about LEEBA, Drew met with its membership and was retained as the benefits coordinator for the union.  As with other unions he assisted, Drew was an outside consultant:  he was never a member of LEEBA's Board, nor did he ever receive a salary from LEEBA.  (*See, e.g.*, Tr. 182-83, 444-45.)   Drew's co-defendant at trial, Kenneth Wynder, ran all aspects of LEEBA.  (*See, e.g.*, Tr. 435.)

When he began working with LEEBA, Drew helped the union to establish dental insurance and life insurance for its members, among other benefits.  (*See, e.g.*, Tr. 143.)  He also helped LEEBA to set up an infrastructure for the Annuity Fund money it received on behalf of certain members pursuant to a contract with New York City.  (*See* GX-211, 212, 216.)  He arranged for a company called Oppenheimer Funds, which was later acquired by Ascensus (*see* Tr. 88), to act as the record-keeper and custodian for the Annuity Fund (Tr. 77, 99).  When the City contributed to the Annuity Fund, the money was directed to a contribution account at Ascensus, and then by Ascensus into individual Annuity Fund members' accounts.   (Tr. 100.)  Members could then direct the funds into certain investments, like mutual funds.  (Tr. 100-01.)

Drew was paid a commission by Ascensus through a broker-dealer.  (Tr. 86-87; GX-459.)  The commission was based on the amount of money invested in certain funds and paid by the funds themselves, not deducted from the Annuity Fund.  (Tr. 94-95, 136.)  Ascensus also charged two types of fees for its services, one which was deducted from the money the City transmitted to the Annuity Fund and the other which – like Drew's commission – was paid by the funds in which members were invested.  (Tr. 96-97, 104.)  Wynder was the plan

administrator for the Annuity Fund.[5]  (Tr. 93.)  The plan administrator could withdraw money

from the Annuity Fund for administrative fees.  (Tr. 113.)  Between 2012 and 2019, LEEBA

made seventeen withdrawals totaling $529,000 from the Fund.  (Tr. 587-88; GX-2208, at 1.)

Wynder typically requested, by text or phone call, that Drew assist him in making a

withdrawal from the Annuity Fund.  (*See, e.g.*, GX-1306-B-7.)  When withdrawals were made,

Drew's office filled out Ascensus's special authorization form, and Wynder would sign it.  (*See,

e.g.*, Tr. 151-52, 175-77.)  In addition, Drew's office created an attachment that reflected the

amount of and purpose for the withdrawal, as communicated by Wynder.  (Tr. 152, 177.)

Ascensus would then write a check to LEEBA, and that check would be deposited into LEEBA's

bank account.  (*See* GX-2208.)

Drew did not have any insight into LEEBA's finances or the uses to which Wynder put

Annuity Fund withdrawals.  Drew did not, for example, have access to LEEBA's bank accounts.

(*See, e.g.*, GX-802, 814, 822.)  He could not, therefore, see that Wynder at times transferred

these withdrawals into his personal bank account or used them for non-union expenses.  (*See* Tr.

419, 519-21.)  He similarly had no control over how Annuity Fund withdrawals were directed

after they were made.

In April and May 2019, in connection with the fifteenth of the seventeen withdrawals

made from the Annuity Fund, Drew inquired of Wynder and other representatives of LEEBA

whether Annuity Fund money could be used to pay LEEBA's outstanding life insurance bill.

(*See* GX-1306-B-6; GX-2102.)  That premium was owed to an insurance company from which

Drew received commissions.  Drew initially indicated that he would "write 'audit'" as the reason

---

[5] Evidence was presented at trial that Drew's name appears as an "Additional Plan Administrator
Contact" on an Ascensus form he signed.  (*See* PSR ¶ 14 & at 29-30; GX-444.)  No evidence
was presented at trial that he acted in that capacity, however.

for the withdrawal (GX-1306-B-6); however, the withdrawal form sent from SPS to Ascensus for $40,000 ultimately read "Administrative Management Cost" (GX-432).  After the withdrawal was made, Drew informed the life insurance company that a "pension admin fee" would cover the balance on LEEBA's account.  (Tr. 317; GX-527.)  Drew was subsequently paid $3,049.08 in commission by the insurer.  (*See* PSR ¶ 132.)

Although the life insurance payment was made, there was no evidence adduced at trial that Drew could have compelled LEEBA to pay the insurer, nor was there evidence offered that he attempted to influence the use of any other Annuity Fund withdrawal.  There was no evidence, or even suggestion, at trial that Drew ever used money from any Annuity Fund withdrawal for his own personal benefit or that he was aware that Wynder was using money from such withdrawals for Wynder's personal benefit – *e.g.*, to attend a Dallas Cowboys game or pay for a Lexus.

### b.  The Impact of the Charges and Conviction on Drew and His Family

Drew's indictment and conviction have profoundly affected him and his family. Although he had voluntarily spoken with the Government concerning its investigation six times between September 2019 and October 2020, Drew was arrested at his home, in front of his children, in July 2021.  (*See* PSR ¶ 54; *see also* Ex. A, at 007 (Rob Anderson).)  The arrest was devastating in particular to Drew's youngest son, who was a high school student living at home at the time and who was awoken and searched by agents.

Following his indictment, Drew was no longer able to run SPS.  (PSR ¶ 106.)  His conviction has also affected his ability to be licensed in his profession.  As a result, the family depends solely on Meg's salary.  (*Id.* ¶ 87, 112.)  After basic expenses, which they have made every effort to reduce, the family has nearly depleted its savings.  (*Id.* ¶ 112 & n.6.)  Both Drew

and Meg are worried about their family's financial future, in particular because their youngest

son is still a student and both of their parents are likely to need increased care as they age. (*See*

*id.* ¶¶ 87, 95; *see also* Ex. A, at 022 (M. Brown).)

The financial and emotional strain on Drew and his family has been compounded by the

especially long road – nearly four years – from the FBI's initial contact with Drew to trial in this

case. After meeting with the Government over the course of more than a year with prior counsel,

Drew was indicted on July 22, 2021.[6] As the Court is aware, trial was set (tentatively, due to

COVID-19 restrictions then in place) for July 11, 2022 and moved thereafter to July 13, 2022.

(Minute Entry dated Oct. 14, 2021 & ECF 108.) The parties engaged in pretrial motion practice,

and Drew and his family emotionally prepared themselves for trial. Shortly before trial

commenced, we learned that we had not received a production the Government intended to make

of 335,222 pages (or approximately 40% of the Rule 16 material in the case). This development

necessitated an adjournment of trial until March 6, 2023. (*See* ECF 135, 148.) On the eve of

that trial date, health issues precluded jury selection from progressing (ECF 187), and, in

consultation with the parties, the Court adjourned trial to May 22, 2023 (Minute Entry dated Apr.

18, 2023).

These events were, as is self-evident, out of Drew's control. The emotional toll on Drew

of these successive delays, and the prolonging of this enormously stressful period of his family's

life, is impossible to quantify (*see* June 30, 2022 Hr'g Tr. 39), but its impact on Drew is evident:

since 2021, when he was indicted, Drew has been treated for generalized anxiety disorder, for

which he is prescribed four different medications. (PSR ¶ 93; *see also id.* ¶ 95.) In blunt terms,

---

[6] Wynder and Steven Whittick, who later pled guilty, were indicted on September 8, 2020. (ECF 6.)

he has aged a lot in the two-and-a-half years since his arrest, and a period of incarceration would be extremely difficult to endure.

Yet, throughout the entire period since his arrest, Drew has remained entirely compliant with the conditions of his pretrial release.  (PSR ¶ 8.)  He has been subject to various restrictions as part of pretrial release for over two years, including since the time of his conviction.  In that time, he has never violated those conditions, and Pretrial Services has determined that is appropriate for him to be on "low risk supervision."  (*Id.*)

## DISCUSSION

### I.  Applicable Legal Standard

Title 18, United States Code, Section 3553(a) requires courts to consider seven factors when imposing a sentence:  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence imposed" "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) "the kinds of sentences available;" (4) "the kinds of sentence and the sentence range established" under the U.S. Sentencing Commission's Sentencing Guidelines; (5) "any pertinent policy statement . . . issued by the Sentencing Commission;" (6) "the need to avoid unwarranted sentence disparities;" and (7) "the need to provide restitution to any victims of the offense."  The guiding principle for applying these factors is that the resulting sentence be "sufficient, but not greater than necessary to accomplish the goals of sentencing."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks omitted).

15

Although courts must start with an accurate calculation of the Guidelines, they are bound only to consider the Section 3553(a) factors, not to impose a Guidelines sentence.  Accordingly, the Guidelines are merely the "starting point and the initial benchmark[,] . . . not the only consideration." *Gall v. United States*, 552 U.S. 38, 49 (2007).  The sentencing judge "may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented." *Id.* at 50.  The reasonableness of a sentence is measured not by "the amount by which a sentence deviates from the applicable Guidelines range" but rather "by the district court's individualized application" of Section 3553(a).  *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).  Consequently, district courts enjoy "considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008).

## II. Advisory Guidelines Calculation

The Probation Department has calculated a total offense level of 23 and that Drew is in criminal history category I, resulting in an advisory Guidelines range of 46-57 months.  (PSR at 40.)  However, Probation recommends a below-Guidelines sentence of 34 months' imprisonment, due to Drew's "personal characteristics, specifically his physical health, familial responsibilities, his lack of criminal history, the fact that the instant offense is non-violent in nature, and his compliance while on pretrial supervision."  (*Id.* at 39.)

We respectfully submit that even if the Guidelines range were 46-57 months, a non-custodial sentence would be appropriate for the particular circumstances pertaining to Drew.  However, we also believe that the Guidelines range described in the PSR is not correct, for two reasons.  First, we believe that, even accepting for purposes of sentencing the Government's presentation of the evidence at trial, the loss amount attributable to Drew should be $149,760,

16

instead of the $529,000 figure used by Probation. This results in a four-level reduction in offense level, because U.S.S.G. §2B1.1(b)(E) would apply (an 8-point increase to the base offense level) instead of U.S.S.G. §2B1.1(b)(G) (a 12-point increase to the base offense level).

Second, a recent amendment to the Guidelines for first-time offenders who, like Drew, meet a variety of other criteria, calls for an additional two-point reduction in the offense level, which the Government does not dispute. Drew's offense level should therefore be six points lower than Probation calculates it, making it 17 instead of 23. An offense level of 17, which results in an advisory range of 24-30 months' imprisonment under the Guidelines, should be applied in this case.

### a. Loss Amount

The PSR calculates the loss amount for which Drew was responsible to be $529,000, resulting in an increase of 12 to the base offense level. As discussed below, this amount should instead be $149,760, resulting in an increase of 8 to the base offense level. *See* U.S.S.G. § 2B1.1(b)(1)(E). This figure accounts for the $60,000 withdrawal discussed in the Court's Opinion and Order denying Drew's Rule 29 motion, *see* ECF 233 at 5-6, plus the amounts withdrawn from the Annuity Fund in May 2019 and after, less legitimate expenses of the Annuity Fund during that period.[7]

Although the Government proved at trial that $529,000 was withdrawn from LEEBA's Annuity Fund between March 2012 and September 2019, the Government did *not* prove that

---

[7] We accept for purposes of this sentencing submission the Government's presentation of the evidence at trial, and likewise do not challenge for purposes of this submission the Court's findings in its Opinion and Order denying Drew's Rule 29 motion. Our calculation of the advisory Guidelines range in this submission (and our discussion in the balance of the submission) is not intended to concede or waive any arguments Drew may choose to raise in any appeal from his conviction or the denial of the Rule 29 motion. *See also supra* n.1.

Drew could reasonably have foreseen this loss resulting from the fraud orchestrated by his co-defendant, Wynder.  Instead, accepting the Government's presentation of the evidence, the Government demonstrated at most that Drew understood that the withdrawals in May 2019 and after, which totaled $105,000, were improper, in addition to a one-off $60,000 withdraw prior to May 2019 that was addressed in the Court's Rule 29 Opinion and Order.

"In the case of jointly undertaken criminal activity," like the wire fraud conspiracy of which Drew was convicted, "specific offense characteristics (such as the amount of loss) shall be determined on the basis of 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'"  *United States v. Capri*, 111 F. App'x 32, 35 (2d Cir. 2004) (quoting U.S.S.G. § 1B1.3(a)(1)(B)).  "[T]he scope of the 'jointly undertaken criminal activity'" that determines the loss amount "is not necessarily the same as the scope of the entire conspiracy."  U.S.S.G. § 1B1.3 cmt. n.3; *see also United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991) ("It is important to note that the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy.")*.*  Instead, in order to hold a defendant responsible for the loss caused by another, sentencing courts must make a particularized determination "1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant."  *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).  "[N]either 'knowledge of another participant's criminal acts,' nor 'aware[ness] of the scope of the overall operation' alone is enough to deem the defendant responsible for the acts of co-conspirators."  *United States v. Khandrius*, 613 F. App'x 4, 7 (2d Cir. 2015) (quoting *Studley*, 47 F.3d at 575).

At trial, the Government presented evidence suggesting that, in approximately May 2019, Drew agreed with Wynder to withdraw money from Annuity Fund accounts for the purpose of

paying LEEBA's life insurance policy (as opposed to administering the Annuity Fund itself).

Indeed, the forfeiture amount calculated by the Government is $3,049.08 (*see* PSR ¶ 132), the

amount in commissions Drew received after that life insurance payment was made.

Comparable evidence was *not* presented as to the withdrawals that preceded that May 16,

2019 transaction, other than the one-off instance addressed in the Court's Rule 29 Opinion and

Order. To the contrary, the evidence adduced at trial suggested that Drew had no visibility into

how Wynder used Annuity Fund money when it was withdrawn. (*See, e.g.*, GX-802, GX-814,

GX-822 (signatory pages for LEEBA's bank accounts, not including Drew's name); *see also* Tr.

444-45 (testimony from LEEBA Board member Robert Meletiche that Drew was not on the

Board and did not draw a salary from LEEBA).) Although the Government is likely to contend

that the invoices prepared by Drew's office to accompany each withdrawal request were

fraudulent, there was no evidence at trial that Drew or his employees saw anything wrong with

preparing a form that simply read "Administrative Expenses," or similar, when directed to do so

by Wynder. (*See, e.g.*, Tr. 162-64 (testimony from Drew's employee Tracey Guy concerning

Drew's lack of concealment of the withdrawals from her); Tr. 185-86 (similar testimony from

SPS employee Jackie Perez).)

The evidence accordingly established, accepting the Government's presentation of it, that

Drew agreed to engage in a conspiracy to take money from the Annuity Fund for improper

purposes in about May of 2019. With the exception of the singular instance described by the

Court in its Opinion and Order denying the Rule 29 motion, which totaled $60,000, Drew should

not be held responsible for conduct preceding May 2019 – such as Wynder's use of Annuity

Fund money for personal expenses, including car payments and a trip to an out-of-state football

game, which were not reasonably foreseeable to Drew. There is no indication in the record that

Drew knew about Wynder's alleged fleecing of the Annuity Fund, let alone that he agreed to participate in it and foresaw the consequences.

To the extent that the Government may argue that Drew's and his office's assistance was essential to Wynder's scheme or that Drew was aware that withdrawals were being made in particular amounts or at a particular frequency, none those reasons is enough to attribute the $529,000 loss amount to him.[8] *See Khandrius*, 613 F. App'x at 7-8 (holding, in a Medicare fraud case, that the fact that defendant posed as a doctor, was aware of the suspicious volume of patients at his clinic, and was paid as a clinic employee was insufficient to show that defendant agreed to the entire scope of the conspiracy); *Studley*, 47 F.3d at 576 (holding that the "ample evidence in the record that [defendant] was aware that [others] were defrauding customers" was insufficient to demonstrate that defendant should be held responsible for losses incurred before he became aware "toward the end of his employment . . . that he was defrauding customers"). The loss amount for the jointly undertaken criminal activity in this case is, therefore, $105,000.

In addition, this amount should be further reduced by the use of Annuity Fund withdrawals after May 16, 2019 for what were undeniably legitimate costs of administering the Annuity Fund. The Sentencing Guidelines require that any loss amount be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). The Government's evidence established that LEEBA paid auditors $42,410 to audit the Annuity Fund specifically (not including audits of the union Welfare Fund or of the union itself), as follows:

---

[8] And, in any event, no evidence was presented at trial that Wynder was unable to make Annuity Fund withdrawals himself.

- 2/3/2017:       $1,210
- 4/21/2017:      $10,330
- 7/13/2017:      $630
- 5/14/2018:      $4,000
- 6/25/2018:      $4,000
- 11/9/2018:      $7,000
- **6/27/2019:       $7,740**
- **8/30/2019:       $7,500**

(*See* GX-745).  Two of these payments, bolded above and totaling $15,240, were made after

Drew could be said to have agreed to participate in the fraudulent withdrawal scheme.

There is no doubt that the cost of necessary audits of the Annuity Fund was an

appropriate withdrawal from that Fund.  (*See, e.g.*, Tr. 112 (testimony of Ascensus representative

Erin Slavin that administrative fees for the Annuity Fund could include "fees to third parties, like

an auditor . . . if they need to audit the plan").)  Subtracting the $15,240 paid to auditors after

May 2019 from the $105,000 in withdrawals for which Drew could arguably be held responsible,

yields a loss amount of **$89,760** from May 2019 onward.  Added to the $60,000 withdrawal

addressed in the Court's Rule 29 Order, this yields a total loss amount of **$149,760**.

The Government asserted in its response to our PSR objections, relying on *United States

v. Byors*, 586 F.3d 222 (2d Cir. 2009), that payments to the auditors should not reduce the loss

amount because Annuity Fund members and the Fund itself did not receive something of value

in exchange for the payments.  However, *Byors* is distinguishable.  In that case, the defendant

raised money for his business through fraudulent means (including misrepresentations to

investors about, among other things, whether he held a patent over the manufacturing process he

would be using), and the appellate court held that the loss amount was not required to be reduced

by the amount of money that was in fact used to capitalize the business.  *Id.* at 224, 226.  In the

case of LEEBA, the City required that the Annuity Fund be audited by accountants "selected by

the Trustees of the Fund and at the expense of the Fund" in order to receive contributions.  (GX-

21

212, at SDNY_00499675.)  The payments to the auditors were not, as in *Byors*, a use of fraudulently obtained funds but rather an expenditure that would have been made in any event and that permitted Annuity Fund members to receive something of value – the City's funding.

Moreover, the Government's assertion, included in the final PSR, that Drew hindered the audits by withholding information – causing higher auditor bills – is misplaced.  Specifically, the Government argues that Drew failed to provide the auditors with information about how the Annuity Fund withdrawals were used, and that, once he did provide that information, the auditors were forced to revise their previously issued financial statement for 2014.  (*See* PSR ¶ 25 & at 31.)  The problem with the Government's theory is that there was no evidence at all at trial (including in the transcript page and exhibit cited by the Government) that Drew ever had the information the auditors needed, let alone provided it belatedly to the accountants.  To the contrary, the testimony of the auditor, Russell Furey, was wholly unclear about from where he received information about the use of Annuity Fund withdrawals for Welfare Fund-related expenses.  (*See generally* Tr. 352-67.)  The fact that the auditors may have at times requested of Drew information that he did not have is of no moment.  For all of these reasons, the total loss amount should be reduced by the payments to accountants for audits of the Annuity Fund.

### b.  Guidelines Amendment Concerning Zero Criminal History Point Offenders

In addition, Drew's offense level should be reduced by two levels due to a new Guidelines provision that became effective on November 1, 2023.  *See* U.S.S.G. § 1B1.11(a) ("The court shall use the Guideline Manual in effect on the date that the defendant is sentenced.").  That amendment provides that offenders with zero criminal history points, who meet certain other criteria that Drew also meets, will receive a two-level decrease in their total offense level.  U.S.S.G. § 4C1.1 (eff. Nov. 1, 2023).  The rationale for the change in the

Guidelines is the lower rate of recidivism by "zero-point offenders."  *See* U.S. Sent'g Comm'n, *2023 Amendments in Brief*, https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_821R.pdf.  Drew falls into this category of defendants with no criminal history.  (*See* PSR ¶ 73.). The amendment is retroactive and applies to Drew.

We understand that the Government has no objection to the application of this new Guideline, and we respectfully request that the Court apply it in Drew's case.[9]  For the avoidance of doubt, we note that, even if the Court accepts the Government's and Probation's calculation of the loss amount as $529,000, this amendment still will reduce the Guidelines level calculated in the PSR from 23 to 21.  (*See id.* at 36.)  For defendants with an offense level of 21 who are in criminal history category I, the Guidelines recommend a sentence of 37-46 months' imprisonment – a recommendation that, for the reasons stated in this memorandum and in the PSR (*see id.* at 38-39), we believe is nonetheless excessive in Drew's case.

### III. The Section 3553(a) Factors Counsel in Favor of a Below-Guidelines Sentence

Whether the Court finds that the advisory Guidelines range is 37-46 months, or agrees with the defense that it is 24-30 months, or comes to a different calculation, the factors in 18 U.S.C. § 3553(a) counsel powerfully in favor of a below-Guidelines sentence, and one that does not require a period of incarceration.

#### a. The Nature and Circumstances of the Offense

There is no question that the offenses of conviction are serious ones.  However, we respectfully submit that Drew's minimal personal gain and circumscribed role warrant particular consideration in determining a just sentence for him.

---

[9] Drew's sentencing was originally scheduled for October 18, 2023.  Prior to its being adjourned to January 17, we raised the applicability of this Guideline in our objections to the draft PSR. The Government did not then oppose the application of this Guideline prior to its effective date.

Unlike Drew's co-defendants Wynder and Whittick, he did not directly profit from the Annuity Fund withdrawals – no money withdrawn from the Fund went into Drew's pockets or bank account or comprised his salary.  The evidence at trial connected one Annuity Fund withdrawal to approximately $3,000 in commissions Drew earned from the life insurance provider The Standard – nothing more.  (*See, e.g.*, Tr. 312-14.)  Even accepting in full the Government's presentation of the evidence, the May 2019 withdrawal had the effect of ensuring that union members did not lose their life insurance benefits.  The hundreds of thousands of dollars withdrawn from the Annuity Fund did not, in the main, benefit Drew, who was paid a commission based on the amount of money invested via the Fund.  (*See* Tr. 136.)

Drew's role in the withdrawals at issue in this case was also limited.  Although he and his colleagues prepared the paperwork for the withdrawals, those withdrawals were clearly directed by Wynder.  Even in the case of the May 2019 withdrawal that was so central to the Government's case against Drew, Drew had to ask Wynder whether it could be done.  (GX-1306-B6 (May 16, 2019 text from Drew to Wynder, "Can I do an admin withdrawal from Ascensus to pay The Standard?").)  Drew's lack of position of authority within the union and lack of access to its bank accounts also meant that he could not direct the withdrawn funds.  No evidence was presented at trial that Drew knew Wynder used Annuity Fund money for anything other than union-related expenses – for example, for Wynder's personal benefit.

The primary driver of the Guidelines offense level in this case is, as is true in most fraud cases, the loss amount.  *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding for consideration of the effect of the loss calculation, observing that, under the Guidelines, "loss amount [i]s the predominant determination of the adjusted offense level for monetary offenses.").  As the Guidelines note, "[t]here may be cases in which the offense level

determined under this guideline [for fraud offenses] substantially overstates the seriousness of

the offense.  In such cases, a downward departure may be warranted."  U.S.S.G. § 2B1.1 app.

n.21(C).  Even if Drew is held responsible for a fraction of the total losses caused by Wynder,

that amount is still likely to overstate his culpability in this particular case, where he, unlike his

co-defendants, never directed Annuity Fund proceeds to himself.  *See, e.g.*, *United States v.

Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) ("As many have noted, the Sentencing

Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend

to place great weight on putatively measurable quantities, such as . . . the amount of financial

loss in fraud cases, without, however, explaining why it is appropriate to accord such huge

weight to such factors.").  We submit, respectfully, that the circumstances of Drew's role in the

offense counsel in favor of leniency at sentencing.

### b.  The History and Characteristics of the Defendant

As detailed above and in the astounding number of letters of support that accompany this

memorandum, Drew is someone who turned an incredibly difficult upbringing – the deaths of

two of his siblings, the abuse by his father, and the financial uncertainty of his childhood – into a

positive and productive family-oriented life.  He worked job after job while in school in order to

develop a career and start his own business.  And, most notably, he has tirelessly helped family,

friends, and community members when they needed his support most.  His remarkable work on

behalf of others is another reason his sentence should be tempered with mercy.  *See, e.g., United

States v. Canova*, 412 F.3d 331, 359 (2d Cir. 2005) (holding that the court did not abuse its

discretion in reducing defendant's Guidelines level due to his extraordinary service as a Marine

Corps volunteer and volunteer firefighter); *United States v. Fishman*, 631 F. Supp. 2d 399, 400

(S.D.N.Y. 2009) (imposing a significantly below-Guidelines sentence in part because of defendant's charitable and civic activities).

The care and support Drew provides is also essential to his family. He plays a crucial role in caring for his aging parents, including his stepfather who was recently seriously ill. He provides the same care to his mother-in-law, who recently lost her husband. He also remains a crucial source of emotional support for his immediate family. These facts point to the appropriateness of a non-custodial sentence. *See United States v. Dimattina*, 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012) (imposing a below-Guidelines sentence where defendant's charitable acts made it clear his criminal behavior was aberrant and where his family depended upon him).

In the same way in which Drew has supported those around him, his family and community have embraced him back. The outpouring of care and concern Drew has received in advance of sentencing is indicative of the support network he has even after his conviction in this case. That support will ensure that Drew resumes the productive and fulfilling life he had before the charges in this case.

Finally, as Probation observed (PSR ¶ 138), Drew's physical health warrants consideration during sentencing. He has a number of health issues that require, at present, 15 medications. (*See* PSR ¶¶ 92-93.) He recently had another health scare. Drew's medical issues can be most effectively addressed, and he can continue to make efforts to improve his own health, if he is permitted to serve a non-carceral sentence.

### c.  A Sentence of Probation Will Adequately Deter Future Criminal Conduct

A sentence of probation in this case fulfills a primary aim of sentencing, deterrence. Involvement in this case is truly an aberration in Drew's life. This is the first time, at 56 years of

age,[10] that he has been accused of, let alone convicted of, a crime.  He has more than 50 years of goodwill behind him and the totality of his life to date should provide great comfort that he will never be before this Court, or any other court, again.  His interactions with the justice system have been, before now, as a witness to a crime, or as an ardent supporter of law enforcement. (*See* Ex. A, at 006 (Rob Anderson), 020, 022-23 (M. Brown).)  Drew's trial and conviction have been profoundly destabilizing to him and his family.  They are also shocking to anyone whose life Drew has touched.  (*See, e.g.*, Ex. A, at 142 (K. Schaeffer), 144 (P. Shaughnessy).)  The charges in this case have also destroyed a business that he imagined he would be able to pass on to his daughter and that was his primary means of supporting himself and his family.  There is no question that Drew will never find himself in the place he was four years ago.  Through the devastating effect the past few years have had on his personal and professional life, Drew has already been severely punished.

A sentence of incarceration is also unnecessary to deter others.  Although there have been a number of high-profile cases in which union leaders used union funds for their own personal gain, we are not aware of other situations like Drew's – where a person not employed by the union was convicted of defrauding that organization because of the possibility of earning commissions on services provided to union members.  For all of these reasons, sentencing Drew to a term of imprisonment is not necessary in order to further the purpose of deterring future bad conduct by others.  Drew's loss of his career, his public indictment and trial, and the experience

---

[10] In addition to his good character, Drew's age makes him unlikely to reoffend.  The Sentencing Commission has found that "[a]ge exert[s] a strong influence on recidivism across all sentence length categories.  Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed."  U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 3, 22 (Dec. 7, 2017) (finding that rearrest rates declined with each age group, with Drew's age group being the second least likely to be rearrested, after those 60 and older).

he has endured for the last several years, constitute sufficient deterrence in the circumstances of his case.

### d. Avoidance of Sentencing Disparities

#### i. *Relevant Statistics Concerning Sentences Imposed Nationally and in this District*

As set out in the PSR, between 2018 and 2022, the average sentence for defendant with a Guidelines level of 23 following a fraud (or other economic offense) conviction was 34 months in prison, a downward variance of at least 12 months. (*See* PSR at 28.) Defendants with a Guidelines level of 21 following a fraud conviction – the applicable offense level here if the loss amount is unchanged from that stated in the PSR but the new Guidelines amendment concerning zero-point offenders is applied – received a sentence of imprisonment of 28 months on average. (*Id.*) This represents a downward variance of at least 9 months. Similarly situated defendants with a Guidelines level of 17 were sentenced to an average of 17 months during the same period, at least 7 months less than the recommended Guidelines sentence. U.S. Sent'g Comm'n, *Judiciary Sentencing INformation (JSIN)*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last viewed Dec. 30, 2023). More generally, approximately 70% of sentences for fraud offenses last year varied from the Guidelines range. U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2022, Southern District of New York* 16, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/nys22.pdf (last viewed Dec. 15, 2023). And, over a fifth of defendants convicted of fraud offenses received a non-custodial sentence in this District. *Id.* at 8. A below-Guidelines sentence is therefore in keeping with those imposed by other courts in this District and around the country, and would not create an undue disparity among sentences for similarly situated individuals.

ii. *Sentences Imposed in Factually Similar Cases*

Sentences in factually similar cases also counsel in favor of a substantially below-Guidelines sentence.  In other cases involving union corruption, defendants far more central to the fraudulent scheme, and who benefited to a much greater degree than Drew did, have received sentences far below their Guidelines ranges.  For example, Edward Mullins, the former president of the Sergeants Benevolent Association, was recently sentenced by the Honorable John G. Koeltl to 24 months' imprisonment for stealing $600,000 from that union.  *See* Press Release, U.S. Attorney's Office, S.D.N.Y., *Edward Mullins, Former President Of NYPD Sergeants' Union, Sentenced To Two Years In Prison For Stealing Union Funds* (Aug. 3, 2023).  Mullins misappropriated those funds, which came primarily from union members' dues, by submitting false expense reports, and used the money for his own personal expenses.  *Id.*  Following a guilty plea, Mullins's stipulated Guidelines range was 33 to 41 months – 9 to 17 months greater than his eventual sentence.  *See* Gov't Sent'g Br. 5, *United States v. Mullins*, 22-CR-120 (S.D.N.Y. July 26, 2023), ECF 86.

Other recent federal cases provide examples of well below-Guidelines sentences for leaders who put union money directly in their pockets.  *See United States v. Earvin*, 15-CR-193 (S.D.N.Y. Nov. 12, 2015), ECF 20, 22, 24 (union president who withdrew approximately $28,000 from union accounts for his own use and who had a Guidelines level of 11 sentenced to three years' probation with six months' home confinement); *United States v. Royal*, 15-CR-132 (M.D. Pa. Dec. 14, 2015), ECF 22, 23, 36 (union president who made approximately $70,000 in unauthorized withdrawals from union accounts and obstructed investigation and who had a Guidelines level of 13 sentenced to probation); *United States v. Jasmin*, 20-CR-531 (C.D. Cal. July 22, 2021), ECF 28, 33 (union president who engaged in multi-year scheme to defraud her

29

union of $185,000 and who had a Guidelines level of 20 sentenced to 28 months' imprisonment); *see also United States v. Pullman*, 19-CR-10345 (D. Mass. May 10, 2023), ECF 305, 307 (union president and lobbyist sentenced to 30 months and 24 months respectively for multiple counts of wire fraud and other offenses related to kickback scheme).  Drew is not in the same category of culpability as these defendants for the reasons discussed above, and even greater leniency is warranted in his case.

      iii.   *Treatment of Others Involved with LEEBA's Annuity Fund*

      The Court may consider a co-defendant's sentence under Section 3553(a).  *See, e.g.*, *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007), *abrogated on other grounds by United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008).  As the Court is aware, one defendant, Steven Whittick, has already been sentenced in this case.  Whittick was LEEBA's treasurer and a member of its Board and the Board of the Annuity Fund.  He was sentenced to a below-Guidelines term of 28 months' imprisonment for tax fraud and for lying to federal investigators.[11]  (ECF 84.)  Although the offenses to which Mr. Whittick pled guilty are different than those of which Drew was convicted, they arise from the same series of events the Government sought to prove at Drew and Wynder's trial.  According to the Government's Sentencing Brief, Whittick "received significant off-the-books payments" of over $107,000 and "also directed such payments to Wynder, which were funded in part by Wynder's embezzlement scheme from the LEEBA Annuity Fund, of which the defendant was a board member and a fiduciary."  (Gov't Br. 1, 10, ECF 74.)  In addition, at the trial of Drew and Wynder, the Government introduced evidence that, after money was transferred from the Annuity Fund into

---

[11] Whittick pled guilty pursuant to an agreement that had a stipulated Guidelines level of 17; however, the Court and the Probation Office determined that the level applicable to Whittick's conduct was 19 (or, a Guidelines range of 30-37 months).  (Nov. 17, 2021 Sent'g Tr. 6-7.)

LEEBA's bank account, Whittick facilitated the transfer of some of those funds into Wynder's and his personal accounts.  (*See* Tr. 534-35 (Catanzaro testimony); GX-1307C & 1307D (Wynder and Whittick text messages concerning deposits).)  Notwithstanding the higher Guideline range calculated for Drew, Whittick's culpability as a union insider who put Annuity Fund money in his personal account (and then evaded taxes on that money) and in Wynder's, is far greater than Drew's.

Although Section 3553(a)(6) requires courts to consider the sentences of defendants "who have been found guilty of similar conduct," we respectfully submit that the outcome for an uncharged LEEBA employee who admitted to participating in defrauding the Annuity Fund also warrants consideration.  The Government's records of its interviews of ████████████, ██████████████████ whom it did not charge with a crime and who did not face a prosecution in this case, demonstrate that she, unlike Drew, was aware of the full extent of Wynder's uses of Annuity Fund withdrawals.[12]  (*See, e.g.*, 3579-050, at 3 (████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████); 3579-023, at 5 (████████████████████ ██████████████████████████████████ ██████).  She also, again unlike Drew, benefited directly from the transfer of Annuity Fund money to LEEBA's accounts.  ████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████ (3579-050, at 1-2.)  When asked about this conduct, ████ frequently dissembled.  For example, ████████████████████████████████

---

[12] The interview notes cited herein are collected in Exhibit B to this memorandum.

████████████████ (3579-002, at 5), but after being shown evidence to the contrary,

████████████████████████████ (3579-015, at 4) and that she

████████████████████" from the Fund that she knew to be improper (3579-050, at 2).

Despite all of this, the consequences for ████ resulting from her facilitation of Annuity Fund

withdrawals will be dramatically different than those for Drew, even if he receives a

substantially below-Guidelines sentence, because ████ was not charged at all.

The conduct of both Whittick and ████ LEEBA insiders who had visibility into the full

scope of the Annuity Fund fraud and profited directly from it, is readily distinguishable from that

of Drew.  We respectfully submit that the fact that Drew is differently situated counsels in favor

of a sentence substantially below the Guidelines range.   In light of all of the other factors

discussed herein, and especially Drew's history and characteristics, a non-custodial sentence is

sufficient, but not greater than necessary, to achieve the policies set forth in Section 3553(a).

### e.  Types of Sentences Available

We acknowledge that probation is not a sentence authorized under the Guidelines for

either the Guidelines level we have calculated or that calculated in the PSR.  *See* U.S.S.G.

§ 5B1.1.  Probation is, however, permitted by statute for the crimes of which Drew was

convicted.  *See* 18 U.S.C. § 3561(a).

Although a sentence of probation would represent a significant departure from the

Guidelines applicable to Drew's case, it is nonetheless a weighty sentence.  As the Supreme

Court has observed, "[w]e recognize that custodial sentences are qualitatively more severe than

probationary sentences of equivalent terms[; however, o]ffenders on probation are nonetheless

subject to several standard conditions that substantially restrict their liberty."  *Gall v. United

States*, 552 U.S. 38, 48 (2007)  Probation, therefore, "metes out significant punishment."  *United

32

*States v. Dokmeci*, No. 13-CR-00455 (JG), 2016 U.S. Dist. LEXIS 30404, at *44 n.79 (E.D.N.Y. Mar. 9, 2016).  For all the reasons stated herein, it is the appropriate and just penalty in this case.

### f.   Providing for Restitution

The interest in ensuring that victims receive restitution is also best ensured by a non-carceral sentence.  At present, Drew is not capable of making significant payments toward a restitution amount (*see* PSR ¶ 112 & n.6); however, he would be much more readily able to assume that responsibility if he were not incarcerated and able to obtain employment.  *See United States v. Musgrave*, 647 Fed. App'x 529, 539 (6th Cir. 2016) (upholding sentence of probation based, in part, on the fact that it would facilitate the payment of restitution to victims).

### IV. A Fine Is Not Warranted

The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a).  Probation recommends in Drew's case that no fine be imposed because he is not able to pay it.  (PSR at 40.)  As is outlined in the PSR, Drew's family's expenses currently exceed their income.  They are working to reduce their expenses and using savings to cover essentials, but they are not able to pay a fine and are unlikely to be able to do so in the near future.  A fine is not warranted here.

### CONCLUSION

Drew has been at the center of his extended family, and to a lesser but meaningful extent, his local community, for his entire adult life.  The outpouring of support he has received in advance of sentencing reflects his continuing importance to them.  It also reflects a life constantly oriented toward helping others.  The offenses of conviction are an aberration in the context of Drew's 56 years of acting with integrity and with the goal of helping people.  For all

of the reasons discussed above, it is unnecessary, and it would be counterproductive, for the sentence imposed on Drew to include a period of imprisonment.  The experience of the last few years has been devastating to him and to his family, and they face a long road ahead to restoring the life that they built.  We respectfully submit that a just sentence in this case is one that does not require a period of imprisonment.  A non-custodial sentence would reflect the seriousness of the offenses of conviction while also reflecting the lifetime of good works Drew has amassed – most of them unglamorous acts of human kindness; the specific circumstances of this case; and how Drew compares to similarly situated defendants.

Dated: New York, New York
December 31, 2023

SPEARS & IMES LLP

By: */s Max Nicholas*

Max Nicholas
Reed M. Keefe

*Attorneys for Defendant Andrew Brown*